In re Jonathan G. FINK &
Jill I. Fink, Debtors.

In re Edward M. WOLKOWITZ,
Plaintiff,

v.

SOLL, ROWE, PRICE, RAFFEL
& BROWNE, INC., et al.,
Defendants.

Bankruptcy No. LA 95–12033 SB.
Adversary No. AD 96–03034.

United States Bankruptcy Court,
C.D. California,
Los Angeles Division.

Sept. 25, 1997.

Jerry S. Phillips, Richman, Lawrence, Mann, Greene, Chizever, Friedman & Phillips, Beverly Hills, CA, for Defendants.

Susan I. Montgomery, Gumport, Reitman & Montgomery, Culver City, CA, for trustee.

## DECISION ON SUMMARY JUDGMENT MOTION

SAMUEL L. BUFFORD, Bankruptcy Judge.

### I. INTRODUCTION

Plaintiff Edward M. Wolkowitz, the chapter 7 bankruptcy trustee, has brought this

action against Soll, Rowe, Price, Raffel & Browne, Inc. ("Soll Rowe") to set aside a $50,000 transfer that Soll Rowe received from debtor Jonathan Fink nine months before this bankruptcy case was filed.

The court finds that the payment was a fraudulent transfer: it was made pursuant to a contract that was illegal, because it violated section 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act") and Rule 10b–5 promulgated thereunder. Alternatively, the court finds that the payment was a preferential transfer that is avoidable because Soll Rowe was an insider as to Fink.

## II. FACTS

### A. Fink's Employment

Jonathan Fink was employed by Soll Rowe from March 1989 to June 1994. When he joined Soll Rowe in 1989, Fink was a principal of the firm. Fink sold his ownership interest in the firm in 1991, and thereafter was an employee. However, at all times relevant to this litigation, Fink held the title of "Managing Director" at Soll Rowe. Soll Rowe claims that in fact at this time Fink was merely a securities salesman, and that Soll Rowe bestowed the managing director title on Fink merely to impress clients and prospective clients of the firm.

Prior to his employment with Soll Rowe, Fink was employed by Bear Stearns. In connection with this employment, Bear Stearns brought litigation against Fink, and obtained a $650,000 judgment again him on September 19, 1991. This judgment rendered Fink insolvent, and he so remained until filing of this bankruptcy case on January 25, 1995.

**1.** Renaissance issued a total of 275,000 Class C warrants in connection with the bridge financing. Soll Rowe's share of the bridge financing warrants was less than 10%.

**2.** The NASD is authorized by § 15A of the 1934 Act, 15 U.S.C.A. § 78s (West 1997), to act as a self-regulatory organization for all brokers and dealers of securities that are traded over-the-counter. Because the Renaissance securities were to be traded over-the-counter, rather than

### B. Renaissance Golf Products Transaction

In 1992 C.L. Harper was president of ANH, Inc. and a partial owner of Renaissance Golf Products, Inc. ("Renaissance"), a closely held corporation that Harper wanted to take public. In November of that year Fink arranged a deal, on behalf of Soll Rowe, with Renaissance to obtain bridge financing while Renaissance's initial public offering ("IPO") was pending. The agreement originally provided that Soll Rowe would receive 2% of Renaissance's publicly offered stock as compensation for its bridge financing efforts. Soll Rowe subsequently agreed to accept 25,000 Class C warrants as its compensation for obtaining the bridge financing, in place of 2% of the public offering.[1]

Renaissance's preliminary prospectus filed with the Securities Exchange Commission ("SEC") disclosed Soll Rowe's compensation, as well as compensation for other principals and underwriters rendering services in the IPO. Upon review of the preliminary prospectus, the NASD[2] objected that the total compensation of 16.07% for the underwriters and related persons (including Soll Rowe) was excessive for an offering of its size and nature.[3]

In order to comply with the NASD comment letter, Renaissance requested that Soll Rowe waive its right to the 25,000 Class C Warrants. Soll Rowe agreed, but only after Fink had negotiated a separate deal with Harper for compensation to Soll Rowe ("the Harper deal"). This deal provided for Harper to assign a portion of his own Renaissance common stock to Fink, for the benefit of Soll Rowe, after the completion of the IPO. In a November 22, 1993 letter to Renaissance, Soll Rowe specifically disclaimed the previous compensation that it was to have been paid.

upon a national securities exchange, the NASD had the authority, subject to the regulation and oversight of the SEC, to ensure that the IPO was in compliance with NASD and SEC rules.

**3.** The total proposed compensation included a 10% underwriting discount, a 3% non-accountable expense allowance, a right of first refusal with respect to future financings, and a unit purchase option valued at 3.07% of the gross proceeds of the offering.

While the revised prospectus for the Renaissance IPO again disclosed compensation paid to "underwriters and related parties," it made no mention of the Harper deal, or of any other compensation for Soll Rowe in connection with the transaction. Furthermore, in a letter sent to Renaissance, Soll Rowe confirmed that neither it nor its officers had received the previously agreed Class C warrants, and disclaimed any future right to this compensation. However, the letter failed to mention the Harper deal, which was made for Soll Rowe's benefit. Nonetheless, the Harper deal was a condition of the waiver by Soll Rowe of the Class C warrants.

After the IPO was completed, Harper assigned 102,000 shares of Renaissance common stock to Fink, pursuant to the undisclosed Harper deal. A month later Fink sold 20,000 of the shares, and the purchaser delivered the entire $50,000 proceeds to Soll Rowe.[4] Soll Rowe received this payment less than ten months before this bankruptcy case was filed.

The trustee now seeks to intercept this payment on its way from Harper to Soll Rowe, by having Soll Rowe return it to Fink's estate for the benefit of Fink's creditors.

## III. ANALYSIS

The Bankruptcy Code gives a trustee the power to avoid a variety of kinds of prepetition transactions. Such transactions include preferential payments to creditors (§ 547[5]), fraudulent transfers (§ 548), the fixing of statutory liens (§ 545), and setoffs (§ 553). In addition, the Bankruptcy Code gives a trustee the same avoiding powers that a creditor has under state law (§ 544(b)).

This adversary proceeding involves two of these avoiding powers under the Bankruptcy Code, the power to avoid fraudulent transfers under section 548, and the power to avoid preferential transfers under section 547. Because Soll Rowe challenges the application of only one element of each cause of action to it, this discussion focuses on the applicable element.

### A. Fraudulent Transfer

■ A transfer that is fraudulent under section 548 may be an intentional fraudulent transfer, or a constructive fraudulent transfer. *See generally Bay Plastics, Inc. v. BT Commercial Corp. (In re Bay Plastics, Inc.),* 187 B.R. 315, 322–23 (Bankr.C.D.Cal.1995). A transfer is an intentional fraudulent transfer if it is made with the actual intent to hinder, delay or defraud a creditor. *Id.* A transfer is a constructive fraudulent transfer if the debtor receives less than reasonably equivalent value in exchange for the transfer, and the transfer is made while the debtor is in financial distress. *Id.*

■ There are three kinds of financial distress that may make a transaction a constructive fraudulent transfer: (a) the debtor is insolvent, or the transfer renders the debtor insolvent; (b) the transfer leaves the debtor undercapitalized or nearly insolvent (i.e ., with insufficient assets to carry on its business); (c) the debtor intends to incur debts beyond its ability to pay. *Id.* Constructive fraudulent transfer law applies without regard to intent (except the intent to incur debts in the last alternative). *See, e.g., Moody v. Security Pacific Business Credit,* 971 F.2d 1056, 1063 (3d Cir.1992) (construing the Uniform Fraudulent Conveyance Act); *Bay Plastics,* 187 B.R. at 323.

### 1. Constructive Fraudulent Transfer—Elements

■ The elements of a cause of action for constructive fraudulent transfer by an insolvent under section 548(a) are as follows: the debtor (1) made a transfer or incurred an obligation, (2) without receiving a reasonably equivalent value in exchange, (3) while insolvent, and (4) within one year before the date

---

**4.** Soll Rowe complains that Fink shortchanged it, because it was entitled to receive 40% of the compensation that Harper paid to Fink, but in fact it received less than 20%.

**5.** Unless otherwise specified, all statutory references are to the Bankruptcy Code, 11 U.S.C.A. §§ 101–1330 (West 1994 & Supp.1997).

of the filing of the bankruptcy petition. *Bay Plastics*, 187 B.R. at 328 & n. 21.

■ Soll Rowe contests only the second element, whether Fink received reasonably equivalent value for the $50,000. It contends that the payment discharged in part a debt that Fink owed to Soll Rowe in a larger amount, and that this constituted reasonably equivalent value. If the payment indeed had discharged a legal debt, in part or in whole, in good faith, Fink would have received reasonably equivalent value, and the transfer would not be assailable as a fraudulent transfer. *Marshack v. Wells Fargo Bank (In re Walters)*, 163 B.R. 575, 581 (Bankr.C.D.Cal. 1994).

The trustee argues that the payment of $50,000 to Soll Rowe by Jonathan Fink was a fraudulent transfer that is avoidable under section 548, because Soll Rowe violated the federal anti-fraud provisions of Rule 10b–5 promulgated under the 1934 Act. Accordingly, the court must examine whether the contract for Soll Rowe's compensation was illegal and void. If so, Fink did not receive reasonably equivalent value for his $50,000 payment to Soll Rowe.

### 2. Violation of Section 10(b) and Rule 10b–5

■ In the wake of the 1929 stock market crash and in response to reports of widespread abuses in the securities industry, Congress enacted two landmark pieces of securities legislation: the Securities Act of 1933 ("the 1933 Act") and the 1934 Act. 48 Stat. 74, as amended, 15 U.S.C. § 77a et seq.; 48 Stat. 881, 15 U.S.C. § 78a et seq. The 1933 Act regulates initial distributions of securities, and the 1934 Act for the most part regulates post-distribution trading. *Central Bank v. First Interstate Bank*, 511 U.S. 164, 171, 114 S.Ct. 1439, 1445, 128 L.Ed.2d 119 (1994); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 752, 95 S.Ct. 1917, 1933, 44 L.Ed.2d 539 (1975). Together, the Acts "embrace a fundamental purpose ... to substitute a philosophy of full disclosure for the philosophy of caveat emptor." *Central Bank*, 511 U.S. at 171, 114 S.Ct. at 1445 (internal quotation marks omitted).

### a. Statutory Provisions

Section 10 of the 1934 Act provides in relevant part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality or interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C.A. § 78j (West 1997).

■ Rule 10b–5 is promulgated by the Securities and Exchange Commission under its rulemaking authority to implement § 10(b) of the 1934 Act. In relevant part, Rule 10b–5 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of the national security exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances they were made, not misleading,
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1997). Liability under Rule 10b–5 is limited to conduct encompassed by the prohibition of section 10(b). *United States v. O'Hagan*, —— U.S. ——,

——, 117 S.Ct. 2199, 2207, 138 L.Ed.2d 724 (1997).

### b. Elements of Rule 10b–5 Claim

 The elements of a claim under section 10(b) and Rule 10b–5 are: (a) using any deceptive device (b) in connection with the purchase or sale of securities, in contravention of rules prescribed by the Commission. *Id.* at ——, 117 S.Ct. at 2206. Section 10(b) and Rule 10b–5 provide a broad remedial rule designed to proscribe all kinds of deceptive devices in connection with the purchase or sale of securities. The prohibitions of these provisions are not limited to the deception of a purchaser or seller: they reach any deceptive device used "in connection with" such a purchase or sale. *Id.* at —— – ——, 117 S.Ct. at 2206–07.

 The most common kind of deceptive device used in connection with the purchase or sale of a security is the misrepresentation or omission of material information. For such a case, the elements of a cause of action are: (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiff justifiably relies; (5) that proximately causes the plaintiff's investment loss. *Gray v. First Winthrop Corp.*, 82 F.3d 877, 884 (9th Cir.1996).

#### i. Misstatement or Omission of Material Fact

 The failure of Soll Rowe to disclose the compensation on the Renaissance deal for which it contracted with Harper (through Fink) is clearly a material omission under Rule 10b–5. Information is "material" if a reasonable investor would view the information as important in making an investment decision. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The Soll Rowe compensation was an essential part of the excess compensation that the NASD's criticized in Renaissance's preliminary prospectus. The court finds that Soll Rowe's failure to disclose its alternate compensation for the underwriting constitutes a material omission that satisfies the materiality requirement of Rule 10b–5.

#### ii. Scienter

 The scienter requirement under Rule 10b–5 is recklessness. *See Gray*, 82 F.3d at 884. The rule is violated by the intentional or reckless misrepresentation or non-disclosure of a material fact in connection with the purchase or sale of securities.

The court infers from the evidence before it that Soll Rowe acted with full knowledge and foresight. In its November 22, 1993 letter to Renaissance, Soll Rowe specifically disclaimed the compensation that it had previously arranged. Soll Rowe clearly intended that Renaissance rely on this letter and delete its disclosure of the Soll Rowe compensation from the prospectus.

Soll Rowe, however, altogether failed to mention the Harper deal. This deal is what motivated Soll Rowe to disclaim its right to the original compensation in the first place. This behavior demonstrates a level of knowledge that more than satisfies the recklessness standard as stated in *Gray*. Thus the scienter requirement of Rule 10b–5 is fully satisfied.

#### iii. Justifiable Reliance

Renaissance and its underwriters justifiably relied on the Soll Rowe letter in which Soll Rowe failed to disclose its underwriting compensation. Because of the letter, and its failure to disclose the Harper deal providing alternative compensation for Soll Rowe, Renaissance and the drafters of its prospectus failed to disclose this compensation. Soll Rowe's omission of the material fact that it had a deal to receive the undisclosed compensation prevented the disclosure of this compensation in the prospectus.

 This omission of material fact constituted a fraud on the market in which the Renaissance securities were sold. There is a presumption that the market relies on all public information in connection with a securities offering. *In re ZZZZ Best Securities Litigation*, 864 F.Supp. 960, 970 (C.D.Cal. 1994) (holding that accountants may be liable for Rule 10b–5 violations where they participate in the creation of public statements regarding the issuer of securities). Where an omission is made in a prospectus pursuant to which securities are sold, it is presumed that the market justifiably relies on this omission. *Basic, Inc. v. Levinson*, 485 U.S.

224, 247, 108 S.Ct. 978, 992, 99 L.Ed.2d 194 (1988). In this case, it is presumed that the securities market justifiably relied on Soll Rowe's omission to disclose its compensation in connection with the underwriting.

### iv. Damage

■ In a Rule 10b–5 case, the plaintiff must prove damage resulting from the securities fraud. Liability under section 10(b) and Rule 10b–5 is not at issue, however, in this case. This case involves the enforceability of an undisclosed contract, where disclosure was required under section 10(b) and Rule 10b–5. If the omission rendered the contract void, payment pursuant to the contract is recoverable from Soll Rowe as a fraudulent transfer. In consequence, the trustee is not required to prove that he was damaged by the omission here at issue. Instead, he must prove his damages under the applicable bankruptcy cause of action.

### v. "In Connection With" Purchase or Sale of Securities

■ Soll Rowe argues that it had no disclosure obligation because it was not the underwriter, and it had no say in what was stated or disclosed in the prospectus. This defense is misguided. A party who provides information to be used in a prospectus is subject to the disclosure requirements of Rule 10b–5. *SEC v. Seaboard Corp.,* 677 F.2d 1301, 1312 (9th Cir.1982) (stating, "[a]n accountant may be liable for direct violation of [Rule 10b–5] if its participation in the misrepresentation is direct and if it knows or is reckless in not knowing that the facts reported in the prospectus" are material misrepresentations). If such a party does not meet the disclosure requirements, it violates section 10(b) and Rule 10b–5.

Furthermore, The United States Supreme Court has made it clear that a secondary actor may be liable as a primary violator under Rule 10b–5. It has stated: "[a]ny person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5." *Central Bank v. First Interstate Bank,* 511 U.S. 164, 191, 114 S.Ct. 1439, 1455, 128 L.Ed.2d 119 (1994); *accord, United States v. O'Hagan,* — U.S. —, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) (holding that a person may be convicted for the criminal violation of section 10(b) and Rule 10b–5 for misappropriating nonpublic information relating to a publicly held company and trading on it).

■ Under this standard, Soll Rowe owed a duty to make complete and adequate disclosure of all material facts that relate to the IPO. If Soll Rowe's own actions were manipulative or its statements or omissions were deceitful, it may be liable for a primary violation of section 10(b) and Rule 10b–5. *ZZZZ Best,* 864 F.Supp. at 970; *Seaboard Corp.,* 677 F.2d at 1312. Because Soll Rowe failed to disclose the Harper deal when it disclaimed its rights to compensation (and permitted Renaissance to submit a prospectus that complied with the NASD comments), Soll Rowe was a participant in the misleading omissions contained in the prospectus.

Soll Rowe also argues that the Harper deal was finalized after the prospectus was published, and therefore that the failure to disclose the deal cannot be a violation of Rule 10b–5. However, the date of finalization of the Harper deal is not material. It was the making of this deal that required disclosure. In any event, Soll Rowe's own evidence makes it clear that the compensation from Harper was a condition of its waiver of the Class C warrants. Moreover, Rule 10b–5 requires the disclosure of any post-effective information necessary to keep a prospectus from being misleading during the offering period: there is a general duty to communicate any additional information which, in its absence, would render misleading that which was already communicated. *Gray,* 82 F.3d at 885; *ZZZZ Best,* 864 F.Supp. at 971. Even if the Harper deal was genuinely made after the final prospectus was issued, Soll Rowe was required to disclose the Harper deal to the public in an appropriate fashion.

Application of section 10(b) and Rule 10b–5 to the conduct of Soll Rowe in this case is consistent with the animating purpose of the 1934 Act: "to insure honest securities mar-

kets and thereby promote investor confidence." *O'Hagan,* —— U.S. at ——, 117 S.Ct. at 2210. In this case Soll Rowe's failure to disclose its compensation in connection with the sale of the Renaissance securities was a classic case of the kind of omission that tends to undermine investor confidence and to jeopardize the securities markets.

The court finds that Soll Rowe's failure to disclose to Renaissance the changes in its compensation relating to the IPO was a material omission of fact which violated section 10(b) of the 1934 Act and Rule 10b–5 [6] promulgated thereunder.

### 3. Agreement Between Fink and Soll Rowe Was an Illegal Contract

■ Only an actual purchaser or seller of securities may bring an action for a violation of section 10(b) and Rule 10b–5. *O'Hagan,* —— U.S. at ——, 117 S.Ct. at 2213; *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). The trustee does not contend in this case that he was either a purchaser or seller of the Renaissance Golf stock at issue in this case. Instead, the trustee uses the violation of section 10(b) and Rule 10b–5 as a grounds for claiming that the contract creating the violation was illegal. For this reason, the trustee argues, there was no valid obligation for Fink to pay the funds to Soll Rowe.

■ A contract for an illegal purpose is void. *Severance v. Knight–Counihan Co.,*

29 Cal.2d 561, 568, 177 P.2d 4, 8 (1947) (holding that an agreement was void that was made to defraud creditors).[7] The violation of section 10(b) and Rule 10b–5 makes the agreement between Fink and Soll Rowe an illegal contract.

### B. Preferential Transfer

In the alternative, even if the agreement between Fink and Soll Rowe had been a legally enforceable contract, the $50,000 transfer by Fink to Soll Rowe on April 11, 1994 was preferential transfer that is avoidable under 11 U.S.C. § 547(b).[8]

■ The five elements of a cause of action for a preferential transfer are set out in the statute. They are: (1) the transfer was made to or for the benefit of the creditor (2) for or on account of an antecedent debt (3) while the debtor was insolvent (4) within 90 days before the date of the filing of the petition, or to an insider within one year before the filing date and (5) it enabled the creditor to receive more than the creditor would have received in a chapter 7 case as its share of the payments to unsecured creditors, if the payment at issue had not been made. *See Committee of Creditors v. Koch Oil Co. (In re Powerine Oil Co.),* 59 F.3d 969, 971 (9th Cir.1995).

Soll Rowe contests only the fourth element of this cause of action: it contends that it does not qualify as an insider with respect to

---

**6.** Soll Rowe is subject to liability under Rule 10b–5, but not under section 12(2) of the Securities Act of 1933, 15 U.S.C.A. § 77/(West 1997), because the statutory language of Rule 10b–5 concerning who is subject to liability is much broader than that of section 12(2). Section 12(2) imposes liability only on sellers of securities, a requirement that Soll Rowe does not meet. The language of Rule 10b–5 does not contain this restriction.

**7.** *See, also,* California Civil Code § 1608, which provides: "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal.Civ.Code § 1608 (West 1997).

**8.** Bankruptcy Code § 547(b) provides:
Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the date of the filing of the petition; or
(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Fink. The court finds that Soll Rowe qualifies as an insider as to Fink.

 Where the debtor is an individual, insiders include "any corporation of which the debtor is a director, officer, or person in control." 11 U.S.C. § 101(31)(A)(iv) (West 1997). At the time that the $50,000 transfer was made, Fink had the title of "Managing Director" at Soll Rowe. Soll Rowe contends that in fact Fink was neither a director nor an officer at that time, and that it gave Fink this title only "to assist him in his relationships with his customers." The court holds that Soll Rowe is estopped to make this argument, because it clothed Jonathan Fink with this title. Soll Rowe should not be surprised to be required to bear the consequences of the title that it bestowed on Fink. The court finds that Soll Rowe was an insider with respect to Fink, in consequence of this title.

Thus the court concludes alternatively that the $50,00 payment from Fink to Soll Rowe was a preferential transfer that is avoidable under Bankruptcy Code § 547(b).

### C. Interest

 The trustee also requests an award of interest against Soll Rowe. Prejudgment interest is awardable in the court's discretion, from April 11, 1994 (the date of the transfer) through the date of judgment at the federal statutory rate applicable on the date of transfer. *Kendall v. Sorani (In re Richmond Produce Co.)*, 151 B.R. 1012, 1022 (Bankr.N.D.Cal.1993) (prejudgment interest accrues on fraudulent transfer claim from the transfer date).

 The court finds that this is an appropriate case for the award of prejudgment interest. Soll Rowe has had the funds in its possession since the date of payment, and should compensate the trustee for the benefits that it has received therefrom. The trustee is also entitled to recover post-judgment interest from Soll Rowe at the federal statutory rate. 28 U.S.C.A. § 1961 (West 1994 & Supp.1997).

### IV. CONCLUSION

The court concludes that the $50,000 payment here at issue was a fraudulent transfer: it was made pursuant to a contract that was illegal, because it violated section 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act") and Rule 10b–5 promulgated thereunder. Alternatively, the court finds that the payment was a preferential transfer that is avoidable because Soll Rowe was an insider as to Fink. The other elements of each cause of action are uncontested. The trustee is also entitled to recover both prejudgment and post-judgment interest.